## Pierce v. Kinsey

*Jerome B. Nulty,* for plaintiffs.
*George H. Knoell, III,* for intervenor.
*James S. Oliver,* for defendant.

DAVENPORT, *J.,* February 18, 1981—

## HISTORY OF THE CASE

The original plaintiffs are a school teacher and her husband, seeking to recover damages from defendant for injuries sustained when defendant's car struck female plaintiff's motorcycle while she was in the course of her school duties.

Petitioner-intervenor in the instant action is Harleysville Mutual Insurance Company, the workmen's compensation carrier for the school district. Harleysville has paid for plaintiff's hospital bills and about half of her usual wages in an amount in excess of $61,000.

Defendant driver carried insurance with Nationwide for a policy limit of $50,000. The nature of plaintiff's injuries is severe, and Nationwide has offered to pay the policy limit to the proper party or parties.

Harleysville now insists that under The Pennsylvania Workmen's Compensation Act of June 2, 1915, P.L. 736, as amended, 77 P.S. § 1 et seq., it is entitled to be subrogated to the entire $50,000 which Nationwide concedes is due plaintiffs in special and general damages. Plaintiffs aver that they are entitled to the benefits workmen's compensa-

tion has already paid out in medical expenses and other economic damage and to the policy limits of the tortfeasor's insurance.

## DISCUSSION

The purpose of the Pennsylvania No-fault Motor Vehicle Insurance Act of July 19, 1974, P.L. 489, is stated to be as follows, at section 102(b): "to establish at reasonable cost to the purchaser of insurance, a Statewide system of prompt and adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims."

This, however, is not the only form of loss contemplated by or affected by the act. For purposes of this discussion there are three types of loss that bear attention. The first is the "basic loss" mentioned in the "Purpose," supra.

As defined by section 103, "basic loss benefits" amount to losses for economic detriment arising from injury due to use of a motor vehicle and are limited to such items as medical care, burial expenses, work losses, replacement services loss and survivor's loss.

The second type of loss is "added loss" which, as defined in section 207 of the act, amounts to property losses covered by additional security that no-fault carriers are mandated to offer their insureds. This loss, also economic, covers items such as car repair or expenses due to loss of vehicle.

The third loss, "noneconomic detriment" means pain and suffering, inconvenience, physical impairment, and other nonpecuniary damage recoverable under tort law.

Savings from the elimination of controversies over fault and abolition of actions for less-than-

severe pain and suffering were seen by the legislature as desirable in providing funds for "extensive benefits" under "basic reparation insurance." (See discussion in Shrager, Pa. No-fault Motor Vehicle Ins. Act § 1:11.4. However, both legislative history and case law make clear the fact that there has *never been any intent to eliminate recovery of damages by seriously injured persons on a fault basis as well as a no-fault basis.*

Occupants of motorcycles are indeed given unusual treatment under the No-fault Motor Vehicle Insurance Act. Section 103 of the act states that:

"'Basic loss benefits' means benefits provided in accordance with this act for the net loss sustained by a victim, subject to any applicable limitations. . . . Basic loss benefits do not include benefits for damage to property. Nor do basic loss benefits include benefits for net loss sustained by an operator or passenger of a motorcycle."[1]

Using this distinction as a basis, the intervenor in the case at bar argues that a motorcycle occupant is not covered by the No-fault Act. This interpretation can be refuted on two grounds.

Section 301(a)(6) *specifically provides for tort liability* in injuries to motorcycle occupants: "A person remains liable for injury arising out of a motorcycle accident to the extent that such injury is not covered by basic loss benefits payable under this act, as described in section 103."

The Shrager text undeniably assumes that this tort liability is a part of the act itself, not just a continuation of tort liability under prior law.

"But the strongest argument is the plain lan-

---

1. This difference in treatment given motorcycle occupants is constitutional: Singer v. Sheppard, 464 Pa. 387, 346 A. 2d 897 (1975).

guage of Section 301(a)(6) which creates a separate threshold for the commencement of a tort claim against third parties on behalf of persons injured in motorcycle accidents. If the occupants of a motorcycle are injured, they can recover the traditional special and general damages under tort law since the damages available under Section 301(a)(6) include those not covered by basic loss benefits and motorcyclists are specifically excluded from obtaining basic loss benefits under Section 103 of the Act." Shrager, supra, §2:5.6.1.

Under the facts of the instant action, tort liability is also permitted under section 301(a)(5) which provides that in the case of "any injury that takes place in this State in accordance with the provisions of this act if such injury arises out of . . . use of a *motor vehicle*" tort remedy is available when the accident results in *serious* and *permanent* injuries. (Emphasis supplied.)

The seriousness of the injuries is not in dispute, but the intervenor is disputing the act's coverage of a motorcyclist's tort recovery. However, section 103 of the No-fault Act contains a definition of "motor vehicle" which depends upon the Vehicle Code. The definition section of the Vehicle Code, in turn, 75 Pa.C.S.A. §102, unequivocally defines "motorcycle" as a "motor vehicle." Thus motorcycles *are* motor vehicles and any serious injury sustained by a motorcycle occupant is covered by section 301(a)(5).

Therefore, Harleysville's assertion that "the tort liability provisions of the No-fault Act does not apply to motorcyclists" is erroneous. (R. Brief of Petitioner Harleysville Insurance Co. in Support of Petition to Intervene, p. 4.) The right to sue in tort for *all* injuries, serious or minor, sustained by a

motorcyclist is specifically given to the victim under the terms of the act.

Despite what the Shrager text refers to as the "clear language" of the act and the judicial history indicating that a workmen's compensation carrier is *not* to be subrogated to a claimant's rights to benefits, the insurance carriers have not been deterred from attempting to intervene and benefit from general damage payments to a victim. Under the language of section 206(a), a workmen's compensation carrier must "pay all that it is required to pay under the provisions of the workmen's compensation statute before the no-fault insurer's financial obligations begin to accrue." Brunelli v. Farrelly Bros., 266 Pa. Superior Ct. 23, 27, 402 A. 2d 1058, 1060 (1979).

The argument of the intervenor in the Brunelli case and in the instant action is essentially the same and is based not in the No-fault Act but rather in the language of the Workmen's Compensation Act, 77 P.S. §671, and on case law evolved from that wording prior to the passage of the No-fault Act.

A similar claim was made in Heusle v. The National Mutual Insurance Co., 628 F. 2d 833 (3d Cir. 1980), where the language of the Federal Medical Care Recovery Act of September 25, 1962, 76 Stat. 593, 42 U.S.C.A. §2651(a), placed the government "in a position of a favored subrogee to the claims of an injured party against the tortfeasor." This straightforward position is analogous to the wording of the workmen's compensation provision the intervenor argues, but the intervenor here must face, as Heusle did, the fact that the situation is now more "complicated" because "the Pennsylvania No-fault Act has drastically altered the legal liabilities created" in a motor accident. The government could not be subrogee for Heusle, despite the wording of the Federal statute relied upon.

The Brunelli court and the Shrager text are in accord in asserting that workmen's compensation carriers cannot make themselves subrogees for the employe-victim for moneys paid out in a tort action covering noneconomic loss. According to the Brunelli reasoning, workmen's compensation benefits *are* "basic loss benefits" which, under section 206(a) are the *workmen's compensation carrier's duty to cover before a no-fault insurer's duty even arises.*

The injured party himself *cannot demand a second payment* for "basic loss" which has been paid by the workmen's compensation carrier from a no-fault carrier, and the workmen's compensation carrier *cannot subrogate itself for a right its intended-subrogee cannot assert.*[2]

The act, in its convoluted way, does appear, how-

---

2. The language used by the Brunelli court is perhaps unfortunate as it appears to stress the inability of the victim to recoup his "basic loss benefits" twice-over on the abolition of tort liability "except for amounts in excess of basic loss benefits." This led intervenor here to reason: "aha! Motorcyclist-victim *has* a tort action for 'basic loss benefits,' therefore the workmen's compensation carrier *can* subrogate itself for any recovery she gets in tort for non-economic injury." In fact, section 102(a)(6)(B) only eliminates the "need to determine fault except when a victim is very seriously injured." Repayment for basic loss is under a contract theory up to the moment that noneconomic loss is contemplated. The real reason that the victim cannot subrogate himself for a second helping of basic loss benefits is not based on tort or contract concepts but on *unjust enrichment.* Had the instant victim been slightly injured and entitled to basic loss benefits only, she would have no right to subrogation from the no-fault carrier on any theory for moneys paid out in workmen's compensation. The fact that this motorcyclist does not theoretically possess a right to contractual payment of basic loss benefits in no-fault, *which would be non-exercisable by any victim under the No-fault Act in any case,* cannot jeopardize her recovery of non-economic benefits.

ever, to provide subrogation under the language of section 111(a)(2) for "added loss benefits." These, as set forth in section 207, amount on the whole to property losses, *economic* loss, that is, above and beyond "basic" loss. Again, the Brunelli court touched on this theme when it stated, at p. 27:

"The victim may recover from the tortfeasor for amounts in excess of the 'basic loss benefits,' and if the victim's no-fault policy provides for 'added loss benefits' . . . the no-fault insurer will be subrogated to the victim's right to recover from the tort-feasor, *but only for economic damages which exceed the 'basic loss benefits' amounts.*" (Emphasis supplied.)

The allegations of the complaint in trespass dated December 14, 1977 and filed by the injured school teacher and her spouse against the negligent driver asks for "damages in excess of $10,000.00" for each plaintiff. Allegations of the victim's count amount to claims for repayment for "basic loss benefits" and "economic benefits" as well. As seen, supra, her tort claims for basic losses, having been paid by her employer's workmen's compensation carrier, are now defunct under the act. All parties admit that victim's claims in the pain and suffering and permanent injury categories alone are worth more than the $50,000 available for distribution.

The husband's claims in the complaint in trespass are for loss of consortium and *cannot* have been brought under the No-fault Act as he does not qualify as a "victim" or "survivor of a deceased victim," and cannot be a recipient of benefits under the "Purpose" of the act. (See, supra, p. _____.). It appears that he has simply exercised his right to initiate a case in trespass independently of the No-fault Act and in conjunction with the trespass ac-

tion of his wife which *is* exercised under no-fault provisions 301(a)(5) and (6). He has been seriously damaged by the negligent tortfeasor in this instance which resulted in loss of "companionship, society and services" of his wife. The "services" in this instance are not merely the traditional euphemism for a sexual relationship and hostessing, but also includes loss of a second income to the family unit and increased financial burden falling on him alone.

## CONCLUSION

There is no indication whatsoever on the record that any of the payment proffered by the tortfeasor's carrier to the victim would be in reimbursement for economic loss in the area of "added loss benefits" — the *only* area in which the No-fault Act mandates subrogation of a carrier. Payment to the husband of the victim would be made entirely independently of the act and on the basis of a tort claim made on a common law theory.

The moneys already paid to the victim by the workmen's compensation carrier are "basic loss benefits" for which the victim herself could not be subrogated. Under the No-fault Act, as a motorcyclist, she was permitted to seek these basic loss benefits *as well as* her noneconomic losses from the tortfeasor's insurer in tort, but as the workmen's compensation carrier is mandated to assume all the "basic loss" "before the no-fault insurer's financial obligations begin to accrue" the policy limit is still available to the victim and her husband under the remedies provided to her under section 301 and to him in common law.

The No-fault Act was never intended to leave seriously injured victims of motor vehicle accidents

with no reparation beyond basic loss benefits. On the other hand, the legislature clearly did intend that workmen's compensation carriers were, where applicable, the first source of basic loss benefits and *not* eligible as subrogees for payments made to the victim. Subrogation rights arise from unjust enrichment, by contract or by statute. Here, both plaintiffs are most assuredly entitled to recover their noneconomic losses from the tortfeasors. To permit subrogation by the intervenor insurance company for recovery of the basic losses paid to plaintiffs under workmen's compensation payments would preclude recovery of the noneconomic losses suffered by plaintiffs. Nowhere does it appear that this was the intent of the no-fault insurance law; therefore the prayer of the intervenor for subrogation of the basic loss benefits paid to the female plaintiff victim is hereby refused.